# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RONALD A. SCHIAVO,
*Petitioner,*

v.

SCOTT ERFE,
*Respondent.*

No. 3:17-cv-2108 (VAB)

## RULING ON PETITION FOR WRIT OF *HABEAS CORPUS*

On August 6, 2018, Ronald A. Schiavo ("Petitioner"), a state prisoner currently

confined at Cheshire Correctional Institution in Connecticut, filed an amended petition[1]

for writ of *habeas corpus* under 28 U.S.C. § 2254, challenging his state conviction for

manslaughter in the first degree with a firearm, in violation of Conn. Gen. Stat. § 53a-

55a(a). Am. Pet., ECF No. 35 (Aug. 6, 2018).

Mr. Schiavo raises four claims: (1) the trial court improperly instructed the jury

on self-defense; (2) the prosecutor's cross-examination of him was improper; (3) the

prosecutor improperly appealed to the jury's emotions during closing argument; and (4)

trial counsel was ineffective by failing to present testimony from an expert in crime scene

reconstruction. *Id.* Warden Scott Erfe ("Respondent") has filed a written opposition to the

amended petition; Mem. of Law in Opp'n to Pet. for Writ of Habeas Corpus ("Resp't

---

[1] Mr. Schiavo filed his initial petition on December 19, 2017. Pet., ECF No. 1 (Dec. 19, 2017). The Court dismissed that petition without prejudice because Mr. Schiavo failed to exhaust his state court remedies with respect to most of the claims raised therein. *See* Ruling on Resp't's Mot. to Dismiss the Pet. for Writ of Habeas Corpus, ECF No. 29 (June 26, 2018). In doing so, the Court informed Mr. Schiavo that he could re-open the case after exhausting his claims in state court, or alternatively, waive all unexhausted claims and proceed only on the exhausted claims. *Id.* at 11. Mr. Schiavo subsequently moved to re-open the case and filed an amended petition stating only exhausted claims. Mot. to Reopen Case, ECF No. 31 (June 29, 2018). The Court granted the motion to reopen and accepted the amended petition. Ruling and Order on Mot. to Re-open Case and Second Order to Show Cause, ECF No. 33 (Aug. 6, 2018).

Mem."), ECF No. 50 (Dec. 26, 2018); and Mr. Schiavo replied. Pet'r's Traverse to Resp't

Order to Show Cause ("Pet'r Reply"), ECF No. 61 (Mar. 8, 2019).

For the following reasons, the amended petition for writ of habeas corpus is

**DENIED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.  The State Court Criminal Proceedings

On February 22, 2000, the State of Connecticut charged Mr. Schiavo with murder,

in violation of Conn. Gen. Stat. § 53a-54a, and the lesser-included offense of

manslaughter in the first degree with a firearm. Appellate Ct. R., Resp't App. A, ECF No.

20-2, at 1 (Feb. 27, 2018). The jury reasonably could have found the following facts:

> In early January, 2000, [Mr. Schiavo] was living with Roland Collier and
> Arlinn Collier. They lived in the first floor apartment of a two floor
> apartment house located at 24 Wall Street in Waterbury.[2] A friend of the
> Colliers, Jennifer Young, introduced the Colliers to the victim, Jomol
> Graham, for the purpose of purchasing drugs. On the afternoon of January
> 28, 2000, [Mr. Schiavo] drove the Colliers to Ansonia so that Roland Collier
> could purchase drugs from Graham. Roland Collier was, however, unable
> to make the purchase. In the early morning hours of January 29, 2000, [Mr.
> Schiavo] and the Colliers decided to break into Graham's car and steal the
> drugs that they knew were kept in the trunk of the car. [Mr. Schiavo] took a
> jacket, sneakers and a briefcase from Graham's car and then drove back to
> the Colliers' apartment. The briefcase contained approximately $2000 in
> cash and approximately two ounces of cocaine. Roland Collier and [Mr.
> Schiavo] divided the cocaine and cash between themselves, and then the
> Colliers and [Mr. Schiavo] smoked cocaine for the next few hours. As the
> morning progressed, the three became increasingly worried about their
> actions and possible repercussions from Graham. Concerned for their
> safety, [Mr. Schiavo] tossed the items they had stolen from Graham's car
> over the fence into the next yard, and he and the Colliers went upstairs to
> the second floor apartment where Roland Collier's sister, Carla Barbera,
> lived. [Mr. Schiavo] and the Colliers sat around Barbera's kitchen table
> using cocaine. At some point during that time, [Mr. Schiavo] removed a .38
> caliber handgun from his pants pocket and placed it on the kitchen table.

---

[2] The second floor apartment was numbered 26 Wall Street. *State v. Schiavo*, 93 Conn. App. 290, 292 n.1 (2006), Resp't App. F, ECF No. 20-7.

Meanwhile, Graham had discovered that his car had been broken into and that items were stolen. Suspecting that Roland Collier had broken into his car, Graham went to see Young, who offered to give him a ride to Waterbury. At approximately 8:30 a.m., the two arrived in Waterbury. They spoke to the Colliers' neighbor, Theresa Morin, and asked her if she knew where the owner of the car parked in front of 26 Wall Street was at that time.[3] Morin pointed to 26 Wall Street and replied that the owner, Roland Collier, was either at home or at a store. Young went to move her car, and Graham walked across the street and entered Roland Collier's apartment. Young joined Graham, and together they searched for Graham's possessions in the Colliers' apartment. Unsuccessful, they left the apartment and went back to Young's car. Recalling that Roland Collier's sister resided in the second floor apartment, Young went back into the house. Young knocked on Barbera's door, which opened into the kitchen.

After hearing Young knocking on the door, the Colliers ran and hid in another room. [Mr. Schiavo] grabbed his handgun and stayed in the kitchen out of sight. Barbera opened the door and after a brief exchange, Young returned to her car and told Graham that Roland Collier was not in either apartment. Graham decided to speak to Barbera directly. The Colliers continued to hide in Barbera's apartment, and [Mr. Schiavo] maintained his position in the kitchen. Barbera's apartment door was still open following her exchange with Young. Graham stuck his head and part of his body in through the opening of the door. As he looked through the opening of the door, [Mr. Schiavo] immediately shot him in the forehead. Barbera asked [Mr. Schiavo] why he had shot the victim, to which [Mr. Schiavo] replied, "I don't know." [Mr. Schiavo] then cleaned the drug paraphernalia off the kitchen table and left the second floor apartment with the Colliers. The Colliers and [Mr. Schiavo] left the apartment in [Mr. Schiavo]'s car. As [Mr. Schiavo] was driving away, he pointed his handgun in Young's direction.

[Mr. Schiavo] and the Colliers traveled together to Maine and then to New York and eventually went to Florida, where [Mr. Schiavo] was apprehended. The handgun that [Mr. Schiavo] used in the shooting was recovered in Maine. Graham died from the gunshot wound two days after being shot by [Mr. Schiavo].

*State v. Schiavo*, 93 Conn. App. 290, 292-95, 888 A.2d 1115 (2006), Resp't App. F, ECF

No. 20-7. After his first trial in 2001, the state court declared a mistrial when the jury was

unable to reach a verdict. *Id.* at 295. After a second trial in September 2002, a jury

---

[3] *See supra* note 1.

acquitted Mr. Schiavo of murder, but convicted him of the lesser-included offense of manslaughter in the first degree with a firearm. *Id.* The state court sentenced Mr. Schiavo to forty years of imprisonment. *Id.*

On direct appeal, Mr. Schiavo raised three claims for relief: (1) the trial court's instructions on the return of property and duty to retreat exceptions to self-defense were improper; (2) the prosecutor improperly appealed to the jury's emotions several times during her closing argument; and (3) the prosecutor improperly asked misleading questions while cross-examining Mr. Schiavo implying that Mr. Schiavo had changed his testimony from his first trial regarding whether he thought Graham had a gun at the time of the shooting. *Schiavo*, 93 Conn. App. at 295, 303-05.

### 1. The Instructional Error Claim

During his criminal trial, Mr. Schiavo claimed that he shot the victim, Mr. Graham, in self-defense. *See* Am. Pet. at 11. He testified that he removed and cocked his gun when Graham told Carla Barbera, the renter of the apartment, that he wanted to come in and search the house. Criminal Trial Tr., 9/13/02 A.M., ECF No. 50-12, 64. According to Mr. Schiavo, Graham then pushed his way into the apartment, closed the door behind him, and immediately saw Mr. Schiavo standing in the kitchen. *Id.* at 65-68. Mr. Schiavo raised his gun and pointed it at Graham. *Id.* at 68-69. Graham then reached toward his back, which Mr. Schiavo thought might have been an attempt to retrieve a gun, and at that moment, Mr. Schiavo fired his gun, which he described as a "reflex action." *Id.* at 71-72. The bullet struck Graham in the forehead, and Graham slid down the wall behind him and hit the floor. *Id.* at 74.

At the conclusion of evidence, the trial court instructed the jury on the issue of

self-defense as follows:

> Self-defense is a means by which the law justifies the use of force that would otherwise be illegal. Once self-defense is raised in a case, the State must disprove the defense beyond a reasonable doubt. Now, in claiming he acted in self-defense -- self-defense, [Mr. Schiavo] is claiming that his use of deadly physical force was justified.
>
>      *  *  *
>
> Although [Mr. Schiavo] raised the defense of justification, the State has the burden to prove beyond a reasonable doubt that [Mr. Schiavo] was not justified in using deadly physical force. If the State does not disprove beyond a reasonable doubt that [Mr. Schiavo] was justified in using deadly physical force, then you must acquit [Mr. Schiavo] of all charges, including any lesser included offense, as I will instruct you and explain to you.
>
> Now, Connecticut General Statutes 53a-19(a) of the Penal Code is the statute which explains and defines self-defense. Now, in this case we're talking about the use of deadly physical force by the defendant. It is, therefore, import -- the last portion of the statute on self-defense is implicated in this case and I'm going to read it to you . . . . "Deadly physical force may not be used unless the actor" -- in this case [Mr. Schiavo] "reasonably believes that such other person" – in this case [Mr. Graham] "is using or about to use deadly physical force or inflicting or about to inflict great bodily harm on" Mr. Schiavo.
>
>      *  *  *
>
> Now, there are certain specific and separate circumstances under which a person is not justified in using deadly physical force. . . . Under the first circumstance as presented in the statute, a person is not justified in using deadly physical force when at the time he uses deadly physical force, he does not reasonably believe the other person is one, about to use deadly physical force against him; or two, about to inflict great bodily harm to him.
>
>      *  *  *
>
> Self-defense requires that you the jury measure the justifiability of [Mr. Schiavo's] actions on the subjective basis, on what [Mr. Schiavo] reasonably believed under the circumstances presented in this case and on the basis of what [Mr. Schiavo] reasonably perceived to be the circumstances. [Mr. Schiavo's] belief must have been reasonable and not irrational or unreasonable under the circumstances. That is, would a

reasonable person in [Mr. Schiavo's] circumstances have reached that belief? It is both a question of what his belief was and whether it was reasonable.

*      *      *

The third circumstance. Under this third circumstance a person is not justified in using deadly physical force if he knows that he can avoid the necessity of using such force by retreating with complete safety . . . . That means both that retreat with complete safety was available and [Mr. Schiavo] knew it. Complete safety means without any injury whatsoever to him.

As I have said, self-defense requires you to focus on the person claiming the self-defense, on what he reasonably believed under the circumstances and it presents a question of fact as to whether retreat with complete safety was available and whether [Mr. Schiavo] knew it . . . . So you must ask yourself: Did [Mr. Schiavo] know that he could avoid the use of deadly physical force by retreating with complete safety? If so, and yet he chose to pursue the use of deadly physical force, you shall reject the self-defense claim.

Now, there is an exception to this duty to retreat and I'm going to bring it to your attention. A person does not have a duty to retreat before using deadly physical force if he is in his own dwelling. Dwelling is defined by statute as the building which is usually occupied by a person lodging therein at night, whether or not a person is actually present . . . .

The . . . dwelling exception to the duty to retreat does not encompass the common areas of the building which [Mr. Schiavo] does not have the exclusive right to use or occupy such as stairways, hallways, and foyers. The dwelling exception to the duty to retreat, however, applies if the person is in his own dwelling. Whether [Mr. Schiavo] was in his own dwelling is a question of fact for you to decide and you are to consider that question from the evidence and testimony presented in the trial in deciding this question of fact.

*      *      *

And the fourth circumstance, another exception -- There is another circumstance that makes the use of deadly force unjustified. If the assailant['s] -- in this case, it's Mr. Jomol Graham -- conduct appears motivated by his claim to property that [Mr. Schiavo] possesses and [Mr. Schiavo] knows that if he surrendered the property that the assailant, Jomol Graham, **would** flee without harming him, then [Mr. Schiavo] may not use deadly force – [he] must surrender the property.

6

*      *      *

To summarize then these instructions . . . regarding justification. Bearing in mind the instructions I have given you regarding justification, the State has the burden to prove beyond a reasonable doubt any one of the circumstances in which a person is not justified in using deadly physical force. If the State has proved beyond a reasonable doubt under the first circumstance one, [Mr. Schiavo] . . . did not, in fact, believe that he was in imminent danger of death or great bodily harm; or two, [Mr. Schiavo] did not have a reasonable basis for his belief; or three, [Mr. Schiavo] did not, in fact, believe that he needed to use deadly physical force to repel the victim's attack or -- alleged attack; or four, that [Mr. Schiavo] did not have a reasonable basis for his belief that he needed to use deadly physical force to repel the victim's alleged attack. If you find that the State has proved beyond a reasonable doubt any one of those circumstances, then you must find that [Mr. Schiavo] was not justified in using deadly physical force.

*      *      *

Or under the third circumstance, the duty to retreat. If the State has proved beyond a reasonable doubt that [Mr. Schiavo] had a duty to retreat and a retreat with complete safety was available to [Mr. Schiavo] and [Mr. Schiavo] knew a retreat with complete safety was available to him, then you must find that [Mr. Schiavo] was not justified in using deadly physical force.

And under the fourth circumstance, if the State has proved beyond a reasonable doubt that Jomol Graham's conduct was motivated by his claim to property that [Mr. Schiavo] possesses; and two, [Mr. Schiavo] knows that if he surrendered the property that Jomol Graham could flee without harming [Mr. Schiavo], then you must find [Mr. Schiavo] was not -- the State proved that, you must find [Mr. Schiavo] was not justified in using deadly physical force.

Criminal Trial Tr., 9/17/02 P.M., ECF No. 50-16, 37-50 (emphasis in original).

After the dismissal of the jury, Mr. Schiavo made several objections to the court's charge. Criminal Trial Tr., 9/17/02 P.M., 77-85. With respect to the self-defense instruction, Mr. Schiavo took exception to the trial court's reading of the full instruction on self-defense as stated in Section 2.8-1 of the State of Connecticut's Criminal Jury

Instruction Guidelines,[4] which included the duty to retreat and initial aggressor exceptions. *Id.* at 81-83. The trial court ruled that its instructions on self-defense complied with the law and that it included many of the proposed instructions submitted by Mr. Schiavo. *See id.* at 86.

With respect to the jury instruction, Mr. Schiavo argued that there was "a reasonable possibility that the jury was misled by the trial court's instruction that [Mr. Schiavo's] use of deadly physical force was not justified if the state proved that [Mr. Schiavo] knew that 'Jomol Graham ***could*** flee without harming [Mr. Schiavo]' if he returned Graham's property." Pet'r's Direct Appeal Br., Resp't App. B, ECF No. 20-3, 20 (quoting Criminal Trial Tr., 9/17/02 P.M., 49) (emphasis in original). He argued that the return of property exception under § 53a-19 requires knowledge that he can avoid the necessity of using deadly force with complete safety by surrendering the property, and therefore, the court's use of the word "could" instead of "would" improperly permitted the jury to conclude that deadly force was not justified if Mr. Schiavo merely knew of a risk or chance that Graham would flee upon return of the property. *See id.* at 26-29.

Mr. Schiavo also argued that the trial court erred in instructing the jury on the duty to retreat exception to self-defense because the evidence plainly showed that he had no such duty. Pet'r's Direct Appeal Br., 29. Specifically, he challenged the trial court's instruction that Mr. Schiavo would have no duty to retreat if he was in his own dwelling and omission of any instruction that a social guest in the dwelling "also ha[s] no duty to retreat before they resort to deadly physical force in the act of self-defense, if they do so during the home invasion of a criminal trespasser they reasonably believe is bent on

---

[4] Criminal Jury Instructions, State of Connecticut Judicial Branch (last visited Apr. 7, 2020), https://www.jud.ct.gov/ji/Criminal/default.htm.

violence." *Id.* at 32 (emphasis omitted). Because Mr. Schiavo was a social guest in Carla Barbera's dwelling when he shot Graham, he argued that, as a matter of law, he had no duty to retreat in this case. *See id.* at 37.

The Connecticut Appellate Court rejected all three claims, finding that (1) there was no reasonable possibility that the jury was misled by the trial court's instruction on the return of property exception, (2) Mr. Schiavo induced any alleged error in the trial court's instruction on the duty to retreat exception, (3) the prosecutor's comments during closing argument were not improper, and (4) the prosecutor's cross-examination, even if improper, did not deprive Mr. Schiavo of due process. *Schiavo*, 93 Conn. App. at 297-99, 304, 307.

After reviewing the charge and applicable case law, the Connecticut Appellate Court held that it was not reasonably possible that the jury was misled by the trial court's instruction on the return of property exception. *Id.* at 298. Although the Connecticut Appellate Court recognized that the trial court "inadvertently substituted the word 'could' for 'would' in its summary to the jury, it used the correct language when giving its lengthy charge to the jury." *Id.* The Connecticut Appellate Court construed the incorrect instruction as a "slip of the tongue" and held that, overall, the jury was given proper guidance on the exception. *Id.* Furthermore, the Connecticut Appellate Court held that Mr. Schiavo's failure to object or take exception to the trial court's incorrect instruction belies his argument that he was deprived of his constitutional right to a fair trial. *Id.* at 298-99.

The Connecticut Appellate Court declined to review Mr. Schiavo's claim regarding the duty to retreat exception because Mr. Schiavo, admittedly, "failed to

request such a more complete charge and did not take an exception to the charge given, which he had requested." *Schiavo*, 93 Conn. App. at 299. Thus, the Connecticut Appellate Court held that Mr. Schiavo induced the trial court to give the challenged duty to retreat exception. *Id.* at 300.

## 2.    The Prosecutorial Impropriety Claim

During direct-examination at his second criminal trial, Mr. Schiavo testified that he pointed his gun at Mr. Graham "[a]s soon as he looked at him." Criminal Trial Tr. 9/13/02 A.M., 70. According to Mr. Schiavo, Graham then appeared to reach behind his back as if he was "going for a gun," at which point Mr. Schiavo shot him in the forehead, which he described as a "reflex action." *Id.* at 71-72.

On cross-examination, the prosecutor attempted to impeach Mr. Schiavo by asking him whether he had testified in his first criminal trial that he saw Graham reach behind his back as if he was attempting to retrieve a weapon. The following is an excerpt of the cross-examination on this issue (Mr. Schiavo's attorney is Michael Moscowitz):

> [PROSECUTOR]:    And in fact, here today when you testified before this jury is the first time that you've ever said that you saw Jomol Graham reaching behind him with his arm pulling at --
>
> [MR. SCHIAVO]:    No.
>
> [PROSECUTOR]:    (Continuing) -- grabbing something?
>
> [ATTORNEY MOSCOWITZ]:    I'm going to object --
>
> [MR. SCHIAVO]:    No.
>
> [ATTORNEY MOSCOWITZ]:    (Continuing) -- Your honor. As she's objected to me, that's a misstatement of the testimony.
>
> THE COURT:    No.
>
> [ATTORNEY MOSCOWITZ]:    And she's used that on me.

[THE COURT]: And that is not a valid basis for an objection, Mr. Moscowitz. The objection is overruled. Answer the question.

[MR. SCHIAVO]: She asked me if I agreed and I don't agree.

* * *

[PROSECUTOR]: Okay. And would you also agree that you testified on September 27, 2001 regarding the facts that you are testifying here today --

[MR. SCHIAVO]: Yes.

[PROSECUTOR]: (Continuing) -- correct? And even when you testified back on that date one year ago, you never indicated that, in fact, you saw Jomol Graham going for what you thought was a weapon?

[ATTORNEY MOSCOWITZ]: I'm going to object.

[MR. SCHIAVO]: That's not true.

* * *

[PROSECUTOR]: My question for you was at this point -- right now -- that it's the first time that you are fully testifying that what you saw was the victim, Jomol Graham, reaching for a gun --

[MR. SCHIAVO]: You're wrong.

[ATTORNEY MOSCOWITZ]: Your --

[PROSECUTOR]: (Continuing) -- is that correct?

[MR. SCHIAVO]: No, that's not true.

[PROSECUTOR]: Now, you --

[ATTORNEY MOSCOWITZ]: Your honor, I'm only going to object. The question and answer -- I'm only going to ask this is not -- She's saying it's the first time you ever -- ever testified.

THE COURT: And his answer was that's not correct, so that's --

[ATTORNEY MOSCOWITZ]: Okay.

THE COURT: (Continuing) -- the proper way to handle it. Objection overruled. Proceed.

[PROSECUTOR]: And you recall being asked the question when you testified on September 27th, 2001, "What did you see?" correct? And I'm referring --

[MR. SCHIAVO]: What page are you on?

[PROSECUTOR]: (Continuing) -- to page 32. And do --

[MR. SCHIAVO]: What number next to the -- next to the --

[PROSECUTOR]: Line 20. And your answer was that you saw that he, meaning Jomol Graham, moved like he was reaching for something, correct?

[MR. SCHIAVO]: Yes.

[PROSECUTOR]: And that was the extent of what you testified to, correct?

[MR. SCHIAVO]: No.

\* \* \*

[PROSECUTOR]: You never testified as you testified here today that you saw Jomol Graham reaching for a gun in his back pocket, correct?

[MR. SCHIAVO]: I didn't just say that I saw him reaching for a gun. What I thought was that when he was reaching that he was reaching for a gun.

Criminal Trial Tr. 9/13/02 P.M., ECF No. 50-13, 90-99.

Mr. Moscowitz began his re-direct examination by addressing Mr. Schiavo's testimony regarding Graham's actions immediately before the shooting, using the transcript from his testimony at the first trial:

[ATTORNEY MOSCOWITZ]: Do you recall testifying on September 27th of the year 2001? Put that down. Do you recall testifying on September 27th, year 2001?

[MR. SCHIAVO]: Yes.

12

[ATTORNEY MOSCOWITZ]:     Do you recall being asked this question: "Did you see his hands? ANSWER: Yes." Do you recall that?

[MR. SCHIAVO]:     Yes.

[ATTORNEY MOSCOWITZ]:     Do you recall being asked this question: "What did you see? ANSWER:     And then he moved like he was reaching for something and like out of a reflex I pulled the trigger." Do you remember that question and that answer?

[MR. SCHIAVO]:     Yes.

[ATTORNEY MOSCOWITZ]:     And do you remember this question: "When you say he moved like he was reaching for something, what? ANSWER: He was standing like that and went like this." Do you remember that answer?

[MR. SCHIAVO]:     Yes.

[ATTORNEY MOSCOWITZ]:     And when you said he was standing and went like this, what did he go like?

THE COURT:          You may stand.

[MR. SCHIAVO]:     He was standing in front of me. I was standing here. Put me in his position, he's standing like this and he reached with his right hand like he was coming behind his back. When he was reaching like this that's when I thought he was going for a gun.

[ATTORNEY MOSCOWITZ]:     So on September 27th the year 2001 you did . . . testify to seeing his hand move; am I correct?

[MR. SCHIAVO]:     Yes.

Criminal Trial Tr. 9/13/02 P.M., 116-17.

Four days later, after the conclusion of evidence, the prosecutor began her closing

argument with the following:

How do we measure a life? In this case, we know that a life has been taken, the life of Jomol Graham. [Mr. Schiavo] tells you that he took his life. No doubt. Yet he stands here before you, the members of the jury, and asks you to say that it's okay, that it's justified.

13

But we know that it's not okay. And how do we know that? We know it from the evidence; we know it from the lack of evidence. We know it from the things that are said that don't make any sense.

We know it from the testimony of the witnesses. And we know it from the things that are then disproven by their evidence. And that's really, in sum, what we talked to you about during voir dire as being your job now to evaluate all of the different evidence that you have before you.

Criminal Trial Tr. 9/17/02 A.M., 20-21.

On direct appeal, Mr. Schiavo claimed that the prosecutor violated his right to due process by asking him misleading questions to imply that he was changing his testimony from the first trial regarding Graham's actions before the shooting. Pet'r's Direct Appeal Br. at 39-41; *Schiavo*, 93 Conn. App. at 305. He also claimed that the prosecutor improperly appealed to the jury's emotions at the beginning of her closing argument by asking them, "How do we measure a life?" and saying that Mr. Schiavo "asks you to say that it's okay, that it's justified." Pet'r's Direct Appeal Br. at 41-42.

The Connecticut Appellate Court concluded that the prosecutor's questions "neither affected the integrity of the trial nor deprived [Mr. Schiavo] of his due process right to a fair trial." *Schiavo*, 93 Conn. App. at 307-08. The Connecticut Appellate Court reasoned that the questions "appear[ed] to be based on [the prosecutor's] mistaken understanding of [Mr. Schiavo's] testimony at his first trial," and the record did not establish "whether the prosecutor's somewhat misguided attempt to impeach [Mr. Schiavo] was anything more than an inadequate review of the transcript from the first trial." *Id.* at 307. Moreover, the Connecticut Appellate Court recognized that Mr. Schiavo "vehemently denied that he had in any way altered his testimony from that given at his first trial," and "counsel was able to rehabilitate [him] on redirect examination." *Id.* at 308. Even if improper, the state's case, according to the Connecticut Appellate Court,

was "overwhelmingly strong," supported by credible witness testimony and physical evidence. *Id.*

As for the prosecutor's closing argument, the Connecticut Appellate Court did not find the opening paragraph, asking "How do we measure a life?", to be improper. *Schiavo*, 93 Conn. App. at 304. Although unartfully crafted, the comments, according to the Connecticut Appellate Court, "were nothing more than a permissible appeal to the jurors to consider the evidence and to use their common sense when evaluating that evidence." *Id.* They did not divert the jury's attention from the facts of the case. *Id.*

### 3. The Ineffective Assistance of Counsel Claim

At his state habeas trial on January 4, 2012, Mr. Schiavo testified that, before his second criminal trial, he had asked Mr. Moscowitz to procure a forensic scientist or crime scene reconstruction expert to corroborate his version of the shooting. Habeas Trial Tr., ECF No. 50-21, 13-15. According to Mr. Schiavo, the expert's testimony would have corroborated his testimony that Graham was inside the apartment and was reaching for something at the time the shot was fired. *Id.* at 32-34. Mr. Moscowitz told him that consulting with a forensic expert was not necessary. *Id.* at 15.

Mr. Schiavo then called as his next witness, Peter Massey, a lecturer in the forensic science department at the University of New Haven. Habeas Trial Tr. at 94. Before teaching, Mr. Massey worked as a Hamden police officer and was employed as a police officer at the time of Mr. Schiavo's second criminal trial. *See id.* at 94-95. Mr. Massey had previously been qualified as an expert in crime scene investigation but had never been qualified as an expert in crime scene reconstruction. *Id.* at 96-97.

In preparation for his testimony, Mr. Massey reviewed the testimony of Carla Barbera and Mr. Schiavo and the medical examiner's findings regarding the bullet wound and the location of Graham's body and performed a comparative analysis. *Id.* at 100. After reviewing the evidence, he opined that Mr. Schiavo's version that Graham had fully entered the apartment and was facing Mr. Schiavo at the time of the shooting was "more plausible" than Barbera's version that Graham had opened the door approximately six or seven inches and peered into the apartment to the point where his shoulders and part of his chest were inside the apartment. *Id.* at 100-04. He concluded that Mr. Schiavo's testimony placing Graham fully inside the apartment was consistent with the location of the body, and his testimony that Graham turned toward the door at the time the shot was fired was consistent with the bullet trajectory path. *Id.* at 104. He acknowledged, however, that the bullet path was also consistent with Barbera's version, that the bullet trajectory could have changed upon striking Graham's skull, and that it was not entirely clear from the evidence where Graham's feet were positioned at the time the shot was fired. *Id.* at 108, 118-20.

Mr. Schiavo then called Mr. Moscowitz as a witness. Habeas Trial Tr. at 125. Mr. Moscowitz testified that he had disagreed with Mr. Schiavo over trial strategy. *Id.* at 128. Mr. Schiavo insisted on pursuing a self-defense theory while Mr. Moscowitz thought that it would be better to focus on reducing the charge from murder to manslaughter or negligent homicide. *Id.* at 128, 141. He acknowledged that Mr. Massey's testimony might have helped Mr. Schiavo's self-defense theory and that he would have used it during the trial. *Id.* at 134-36, 157. He maintained that such testimony, however, also could have helped the state's case because it could have drawn the jury's attention to the bullet

wound in the center of Graham's forehead, which would more likely support a murder charge than a lesser offense. *Id.* at 148-49, 156.

Moreover, he acknowledged that there was other evidence of guilt that the expert's testimony would not have changed, such as the fact that Mr. Schiavo retrieved and cocked the gun before Graham even entered the apartment, the lack of any conversation between Mr. Schiavo and Graham before the shooting, that a gun was never found on Graham's person, testimony that Mr. Schiavo also pointed the gun at Jennifer Young after the shooting, and the absence of any claim of self-defense in Mr. Schiavo's statement to the police. *Id.* at 137, 142-44, 165.

When questioned directly by the state court judge, Mr. Moscowitz also acknowledged that the jury could have disbelieved both Barbera's testimony that Graham did not fully enter the apartment and Mr. Schiavo's testimony that Graham made what appeared to be a threatening movement before he fired his weapon and, therefore, rejected the self-defense argument regardless of Graham's position at the time of the shooting. *Id.* at 159-60.

After reviewing the testimony from both the second criminal trial and the habeas trial, the trial judge presiding over the state habeas proceeding concluded that Mr. Moscowitz's representation of Mr. Schiavo was neither deficient nor prejudicial under the United States Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984). *Schiavo*, 2012 WL 4122911, at *3.

With respect to Mr. Moscowitz's performance, the state court ruled that it "was a sound tactical decision" to attack Carla Barbera's credibility through cross-examination rather than calling an expert, noting that Mr. Moscowitz had impeached Barbera using

her statement to the police, which indicated that Graham had fully entered the apartment before being shot, and Mr. Moscowitz's testimony that it may be beneficial not to call an expert in some cases. *Id.* at **4-6. The court did not credit Mr. Massey's testimony because (1) he did not review Barbera's entire testimony,[5] and (2) other evidence of guilt contradicted his opinion regarding how Graham was shot, including the medical examiner's findings of bullet trajectory, the fact that Graham was taller than Mr. Schiavo, and Barbera's testimony regarding Graham's movements after being shot. *See id.* at *6.

That court also ruled that, even if Mr. Massey's testimony would have assisted Mr. Schiavo's defense, there was no reasonable probability that the jury would have reached a different conclusion with respect to self-defense, because the case was not limited to a credibility contest between Mr. Schiavo and Barbera. *Id.* at *7. The state also presented testimony from witnesses regarding the defendant's conduct before and after the shooting and physical evidence to corroborate the witnesses' testimony. *Id.*

On March 14, 2006, the Connecticut Supreme Court denied Mr. Schiavo's petition for certification to appeal the Appellate Court's decision. *State v. Schiavo*, 277 Conn. 923, 895 A.2d 797 (2006), Resp't App. H, ECF No. 20-9.

### B. Procedural History

On May 11, 2006, Mr. Schiavo filed his first petition for writ of habeas corpus in state court. Case Detail, Resp't App. I, ECF No. 20-10 at 4. In this first petition, he claimed, *inter alia*, that trial counsel, Michael Moscowitz, was ineffective for failing to

---

[5] Mr. Massey testified during the habeas trial that he did not receive the full transcript of Barbera's testimony or the complete autopsy report. Habeas Trial Tr. at 112-13. In his second state habeas petition, Mr. Schiavo claimed that counsel from his first habeas trial, Walter Bansley, was ineffective for failing to provide Mr. Massey with all of the materials from the criminal case to make his testimony believable at the first habeas trial. *Schiavo*, 2015 WL 1867887, at *3. The state court rejected this claim based on Mr. Massey's testimony that the additional material would not have changed his opinion. *Id.*

retain and present expert witness testimony on crime scene reconstruction. Third Am. Pet., Resp't App. I, 7. After hearing the evidence, the state court denied the petition, concluding both that Mr. Moscowitz was not deficient in failing to present expert witness testimony and that the decision not to present such testimony was not prejudicial to Mr. Schiavo. *Schiavo v. Warden*, No. TSRCV0604001086S (Cobb, J.), 2012 WL 4122911, at *6-7 (Conn. Super. Ct. Sept. 20, 2012); Mem. of Decision, Resp't App. I, 23-26. The Appellate Court affirmed the habeas court's decision in a *per curiam* opinion, *Schiavo v. Comm'r of Corr.*, 148 Conn. App. 905, 86 A.3d 1100 (2014), Resp't App. L, ECF No. 20-13; and, thereafter, the Supreme Court denied discretionary review, *Schiavo v. Comm'r of Corr.*, 311 Conn. 946, 90 A.3d 976 (2014), Resp't App. N, ECF No. 20-15.

On September 10, 2012, Mr. Schiavo filed his second state habeas petition. Pet'r's Br. on Appeal from Second Habeas, Resp't App. O, ECF No. 20-16, 31. In that petition, Mr. Schiavo claimed, *inter alia*, that counsel from his first habeas proceeding, Walter C. Bansley, failed to prepare his crime scene expert adequately and effectively for his testimony about the forensic and ballistic evidence and adequately challenge the failure of his previous attorney, Mr. Moscowitz, to call the expert witness. Am. Pet., Resp't App. O, 35. The state court denied that petition, concluding that Mr. Schiavo failed to show that Mr. Bansley was ineffective. *Schiavo v. Warden*, No. TSRCV124004954S (*Fuger, J.*), 2015 WL 1867887, at **3-4 (Conn. Super. Ct. Mar. 31, 2015). Afterward, the Appellate Court affirmed the habeas court's decision in a *per curiam* opinion, *Schiavo v. Comm'r of Corr.*, 170 Conn. App. 901, 151 A.3d 895 (2017), Resp't App. R, ECF No. 20-19; and the Supreme Court denied discretionary review, *Schiavo v. Comm'r of Corr.*, 325 Conn. 903, 155 A.3d 1270 (2017), Resp't App. T, ECF No. 20-21.

Mr. Schiavo filed the instant federal petition on December 19, 2017. Pet., ECF

No. 1 (Dec. 19, 2017). He filed his amended petition on August 6, 2018. Am. Pet.

## II.     STANDARD OF REVIEW

A court will entertain a petition for writ of habeas corpus challenging a state

court conviction under § 2254, only if the petitioner claims that his custody violates the

Constitution or federal laws. *See* 28 U.S.C. § 2255(a). A claim that a state conviction was

obtained in violation of state law is not cognizable in federal court. *See Estelle v.*

*McGuire*, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is

limited to deciding whether a conviction violated the Constitution, laws, or treaties of the

United States.").

Section 2254(d) "imposes a highly deferential standard for evaluating state-court

rulings and demands that state-court decisions be given the benefit of the doubt." *Renico*

*v. Lett*, 559 U.S. 766, 773 (2010) (citations and internal quotations omitted). A court

cannot grant a petition for writ of habeas corpus filed by a person in state custody with

regard to any claim that was rejected on the merits by the state court unless the

adjudication of the claim in state court either:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law,
> as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented
> in the State court proceeding.

28 U.S.C. § 2254(d). *See Metrish v. Lancaster*, 569 U.S. 351, 357-58 (2013) (noting that

the habeas corpus relief standard is difficult to meet as "a state prisoner must show that

the challenged state-court ruling rested on 'an error well understood and comprehended

in existing law beyond any possibility for fairminded disagreement.'" (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Clearly established federal law is found in holdings, not dicta, of the United States Supreme Court at the time of the state court decision. *Howes v. Fields*, 565 U.S. 499, 505 (2012); *see also Carey v. Musladin*, 549 U.S. 70, 74 (2006) (stating again that clearly established law comes from holdings, not dicta). "[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court.'" *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting 28 U.S.C. § 2254(d)(1)). A decision is "contrary to" clearly established federal law when it applies a rule different from that set forth by the Supreme Court or if it decides a case differently than the Supreme Court on essentially the same facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002).

A state court unreasonably applies Supreme Court law when it has correctly identified the law but unreasonably applies that law to the facts of the case, or refuses to extend a legal principle clearly established by the Supreme Court to circumstances intended to be encompassed by the principle. *Davis v. Grant*, 532 F.3d 132, 140 (2d Cir. 2008).

It is not enough that the state court decision is incorrect or erroneous. *Eze v. Senkowski*, 321 F.3d 110, 124-25 (2d Cir. 2003). Rather, the state court application of clearly established law must be objectively unreasonable, a substantially higher standard. *Id.*; *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Thus, a state prisoner must show that the challenged court ruling "was so lacking justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 389 (2000) ("state-court judgments must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated").

When reviewing a habeas petition, the court presumes that the factual determinations of the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears the burden of rebutting that presumption by clear and convincing evidence. *Id.* Moreover, this Court's "review under section 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The petitioner may not prevail based on new evidence that was not available to the state court in the first instance. *Id.* at 182.

## III. DISCUSSION

Mr. Schiavo raises three grounds for relief.

First, he argues that the criminal trial court improperly instructed the jury on the return of property and duty to retreat exceptions to self-defense, and the Appellate Court incorrectly held that it was not reasonably possible that the jury was misled by those instructions. Am. Pet. at 9-22.

Second, he claims that the prosecutor improperly "fabricated evidence" by asking him questions during cross-examination that she knew were untrue and improperly appealed to the jury's emotions during closing argument. *Id.* at 23-33.

Third, he contends that Attorney Moscowitz was ineffective for failing to call a crime scene expert. *Id.* at 35-70.

In response, Warden Erfe argues that Mr. Schiavo's instructional error claim is one of state law interpretation and not cognizable in federal court, and alternatively, the jury was not misled by the trial court's instructions. Resp't Mem. at 9-25.

As for the remaining two grounds for relief, Warden Erfe contends that the prosecutor's questions during cross-examination and remarks during closing argument were not improper, and the state court's determination that Attorney Moscowitz provided effective representation did not constitute an unreasonable application of any clearly established United States Supreme Court precedent. *Id.* at 25-48.

For the reasons set forth below, the Court agrees that Mr. Schiavo has failed to satisfy his burden with respect to any of his grounds for relief.

## A.     The Instructional Error Claim

"The charge to the jury in a state-court trial 'is normally a matter of state law and is not reviewable on federal habeas corpus absent a showing that the alleged errors were so serious as to deprive [the] defendant of a federal constitutional right.'" *Rosario v. Tracy*, No. 03-CIV-8589 (RCC) (MHD), 2005 WL 2464996, at *3 (S.D.N.Y. Oct. 5, 2005) (quoting *United States ex rel. Smith v. Montanye*, 505 F.2d 1355 (2d Cir. 1974)). Thus, the fact that the trial court's instruction was allegedly incorrect under state law is not a basis for federal habeas relief. *Estelle*, 502 U.S. at 71-72.

In order to obtain habeas relief on an instructional error claim, the petitioner must establish that the error "violated some right which was guaranteed to [him] by the Fourteenth Amendment." *Singleton v. Comm'r of Corr.*, No. 3:10-CV-1432 (SRU), 2017

WL 3081665, at *8 (D. Conn. July 19, 2017) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146 (1973)); *see also Rosario*, 2005 WL 2464996, at *3 (petitioner must show not only that instruction misstated state law, but also that error violated right guaranteed to him by federal law). The question to be resolved is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Cupp*, 414 U.S. at 147).

Mr. Schiavo first contends that he is entitled to habeas corpus relief because the trial court improperly instructed the jury on the issue of self-defense. Am. Pet. at 9. Specifically, he claims that the court misinterpreted the self-defense statute, Conn. Gen. Stat. § 53a-19, and diluted the state's burden of proof on the return of property and duty to retreat exceptions to self-defense. *Id.* at 10-19.

Warden Erfe responds that Mr. Schiavo's claim is one of state law and therefore is not reviewable by this Court. Resp't Mem. at 11. Alternatively, Warden Erfe argues that Mr. Schiavo has failed to establish that the instructional errors amounted to a violation of due process. *Id.* at 15-24.

Contrary to Warden Erfe's argument, Mr. Schiavo's challenge to the trial court's instruction on the return of property exception to self-defense is reviewable now. Because Mr. Schiavo had not preserved that claim at trial, he appealed the claim as stating one of constitutional error, which the Appellate Court reviewed under *State v. Golding*, 213 Conn. 233, 239-40 (1989).[6] *Schiavo*, 93 Conn. App. at 295-96.

---

[6] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." *State v. Taupier*, 330 Conn. 149, 165 n.13, 193 A.3d 1 (2018) (internal quotation omitted).

The Connecticut Appellate Court concluded that Mr. Schiavo's claim was of constitutional magnitude because proper jury instructions on the elements of self-defense implicate a defendant's right to present a defense under the Fourteenth Amendment. *See id.* at 297. Thus, the Connecticut Appellate Court did not decide this claim on independent, state law grounds.

Moreover, this District's courts have analyzed similar instructional error claims raised in federal habeas petitions. *See Bellino v. Armstrong*, No. 3:03-CV-1346 (DJS), 2007 WL 283090, at **6-7 (D. Conn. Jan. 30, 2007) (reviewing Connecticut Appellate Court's decision on petitioner's claim that trial court improperly failed to instruct jury on duty to retreat in accordance with § 53a-19); *Whitford v. Comm'r of Corr.*, No. 3:03-CV-867 (WWE), 2004 WL 966302, *6 (D. Conn. Apr. 27, 2004) (reviewing Connecticut Supreme Court's decision on claim that trial court failed to define "initial aggressor" in self-defense charge, improperly gave duty to retreat instruction, and improperly instructed jury on subjective/objective test only with respect to use of deadly force); *but see Wright v. Charles Lee*, No. 3:09-CV-01206 (SRU), 2017 WL 2938193, *6 (D. Conn. July 10, 2017) (petitioner's claim that trial court failed to charge jury on justification defense not reviewable because Connecticut Appellate Court decided claim on state law grounds). Therefore, Mr. Schiavo's claim challenging the trial court's instruction on the return of property exception is reviewable.

Nevertheless, Mr. Schiavo has failed to establish that the Connecticut Appellate Court's decision on this claim contradicted or constituted an unreasonable application of any clearly established United States Supreme Court law. The Connecticut Appellate Court correctly reviewed the instruction as a whole and determined that it was not

reasonably possible that the jury was misled by the trial court's isolated misstatement in the return of property instruction. *Schiavo*, 93 Conn. App. at 297-98. The Connecticut Appellate Court's use of this standard is consistent with well-established Supreme Court precedent. *See Middleton v. McNeil*, 541 U.S. 433, 437 (2004) ("'[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge[.]'" (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990))).

Although the trial court, in one instance, inadvertently substituted the word "could" for "would" in summarizing the issue of self-defense, the trial court correctly explained to the jury in its more detailed instruction on the return of property exception that Mr. Schiavo's use of deadly force would not be justified if (1) Graham's conduct appeared to be "motivated by a claim to property that [Mr. Schiavo] possesses, and [(2)] [Mr. Schiavo] knows that if he surrendered the property that . . . Graham would flee without harming him . . . ." Criminal Trial Tr. 9/17/02 P.M., 47; *Schiavo*, 93 Conn. App. at 298.

Moreover, when viewing the instruction in its entirety, the return of property exception was just one of four circumstances under which the jury could have found that Mr. Schiavo was not justified in using deadly force, and as the Appellate Court noted in its opinion, Mr. Schiavo did not object or take exception to the return of property instruction despite objecting to other portions of the self-defense charge. *Schiavo*, 93 Conn. App. at 298-99; Criminal Trial Tr. 9/17/02 P.M., 79-84.

Mr. Schiavo argues that the trial court's inaccurate instruction on the return of property exception diluted the state's burden of proof by permitting the jury to conclude that he had to surrender property to Graham, if he knew that there was any chance that

Graham would flee upon doing so. *See* Am. Pet. at 10; Pet'r Reply at 23. But Mr. Schiavo is viewing the trial court's summary of the self-defense issue in isolation and fails to account for the fact that the trial court correctly instructed the jury on the law when explaining the return of property exception in detail.

He also argues that the state exacerbated the harm caused by the incorrect instruction when it stated the following in closing argument:

> And finally, the Court's going to tell you that if [Mr. Schiavo] can return property that belongs to the person he is having the dispute with, what I guess I'm saying is if a victim is attempting to reclaim property that belongs to them, and a defendant can give back that property, he must do so before using force.

Criminal Trial Tr. 9/17/02 A.M., ECF No. 50-15, 28; Am. Pet. at 11. Indeed, the state's argument did not explain all of the required elements of the return of property exception, particularly the requirement that a defendant know he can avoid the necessity of using deadly force with complete safety. *See* § 53a-19(b). Nevertheless, Mr. Schiavo did not address this omission in his closing argument, and the trial court's detailed instruction on the return of property exception was correct on the law.

Mr. Schiavo's reliance on *Government of the Virgin Islands v. Smith*, 949 F.2d 677 (3d Cir. 1991), and *Turrentine v. Mullin*, 390 F.3d 1181 (10th Cir. 2004), are misplaced. Pet'r Reply at 14-23. In *Smith*, the trial court refused to give a self-defense instruction despite the fact that the evidence warranted such an instruction. 949 F.2d at 681-82. In *Mullin*, the state reviewing court applied the wrong harmless error standard when analyzing the petitioner's instructional error claim. 390 F.3d at 1190.

Both of these cases are distinguishable. Here, the trial court misstated one reading of one of four exceptions to self-defense, but correctly charged the jury on the law when

it explained the exception in greater detail. When viewed in the context of the charge as a whole, the trial court's instruction did not amount to a violation of due process, the Connecticut Appellate Court's review of the instructional error claim did not misapply any established United States Supreme Court precedent, and Mr. Schiavo has not pointed to any Supreme Court authority to show otherwise.

Unlike the challenge to the return of property instruction, Mr. Schiavo's claim regarding the duty to retreat instruction, however, is not reviewable in this Court. "[I]t is a well-established principle of federalism that a state decision resting on an adequate foundation of state substantive law is immune from review in federal courts." *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977). A federal court "will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *Harris v. Reed*, 489 U.S. 255, 260 (1989). This doctrine has been routinely applied to state court judgments rejecting claims because of procedural default. *See id.* at 261.

In this case, the Connecticut Appellate Court clearly dismissed Mr. Schiavo's claim with respect to the duty to retreat instruction because the instruction was given in response to his request, and he failed to request a more complete charge or take exception to the charge given. *See Schiavo*, 93 Conn. App. at 299. Thus, the Appellate Court concluded that Mr. Schiavo had "induce[d]" the alleged instructional error and, therefore, rejected his claim as procedurally defaulted. *Id.* at 299-300; *see also State v. Alston*, 272 Conn. 432, 455-56 (2005) ("actions that are induced by a party cannot be grounds for appealable error; therefore, they do not merit review"). Because the Appellate Court

clearly rejected this claim on independent state grounds, it is not reviewable here.

Mr. Schiavo argues that he attempted to challenge the trial court's duty to retreat instruction, but the trial court interrupted him mid-sentence. Am. Pet. at 20. This argument is unavailing. There is no indication from the record that Mr. Schiavo intended to challenge the duty to retreat instruction when given the opportunity to address the trial court directly after the charge. Moreover, Mr. Schiavo never claimed on direct appeal or in any of his state habeas petitions that the trial court prevented him from challenging its duty to retreat instruction. Therefore, his claim with respect to the duty to retreat instruction remains unreviewable for purposes of this petition.

### B.    The Prosecutorial Impropriety Claim

"In evaluating a claim of prosecutorial [impropriety], the [C]ourt considers the prosecutor's conduct in the context of the entire trial 'to determine whether the prosecutor's behavior amounted to prejudicial error.'" *Fluker v. Falcone*, No. 3:16-CV-82 (SRU), 2018 WL 3862692, at *11 (D. Conn. Aug. 14, 2018) (quoting *United States v. Young*, 470 U.S. 1, 12 (1985)). "[A] prosecutor's misconduct gives rise to [a] constitutional due process violation only when it 'so infect[s] the trial with unfairness' to deny the defendant's right to a fair trial." *Little v. Comm'r of Corr.*, No. 3:14-CV-00654 (JAM), 2017 WL 6028336, at *4 (D. Conn. Dec. 5, 2017) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 636, 643 (1974)); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) ("[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.").

Like his instructional error claim, Mr. Schiavo's prosecutorial impropriety claim is two-fold. First, he claims that the prosecutor improperly impeached him with his testimony from his first trial to establish an inconsistency with his second trial testimony and attack his credibility even though the prosecutor knew that there was no inconsistency in the testimony. *See* Am. Pet. at 26. Second, he claims that the prosecutor improperly appealed to the jury's emotions during closing argument. *Id.* at 32.

In response, Warden Erfe argues that the Connecticut Appellate Court's resolution of these claims was not contrary to, or an unreasonable application of, clearly established federal precedent.

In this case, the Connecticut Appellate Court's conclusion that neither the prosecutor's cross-examination nor her closing argument amounted to a violation of due process is consistent with well-established United States Supreme Court precedent. Although she failed in her attempt to show an inconsistency between Mr. Schiavo's testimony during his first trial and that of his second trial, there is nothing in the record to indicate that the prosecutor's attempted impeachment was malicious or done with knowledge that Mr. Schiavo's testimony had not changed.

As the Connecticut Appellate Court recognized, the record reflects that the prosecutor was mistaken in her belief that Mr. Schiavo's testimony during the second trial contradicted that of his first trial. *See Schiavo*, 93 Conn. App. at 307. Even if the prosecutor's cross-examination was improper, the Connecticut Appellate Court properly applied the same standard articulated in *Donnelly* and *Darden* in concluding that her conduct did not "so infect[] the trial with unfairness as to make the resulting conviction a

denial of due process." *Id.* (quoting *State v. Serrano*, 91 Conn. App. 227, 240, 880 A.2d 183 (2005)).

Similarly, the Connecticut Appellate Court's rejection of the improper closing argument claim did not constitute an unreasonable application of well-established United States Supreme Court law. Although the Connecticut Appellate Court noted that the prosecutor's opening remarks "could have been phrased more artfully," it recognized the importance of affording attorneys some leeway in offering closing arguments to a jury and concluded that the remarks were a fair appeal to the jurors to apply their common sense when reviewing the evidence. *Schiavo*, 93 Conn. App. at 304. Indeed, the *Darden* Court and courts in this Circuit have rejected due process claims based on far more inflammatory remarks. *See Darden*, 477 U.S. at 180 n. 11, 180 n.12 (rejecting impropriety claim based on prosecutor's reference to defendant as an "animal" and statement, "I wish I could see [defendant] sitting here with no face, blown away by a shotgun"); *Moore v. Conway*, 476 F. App'x 928, 931 (2d Cir. 2012) (prosecutor's reference to defendant as a "predator" did not amount to due process violation).

Moreover, the Appellate Court properly viewed the alleged improprieties in the context of the entire trial and noted that the state's case was "overwhelmingly strong." *See Darden*, 477 U.S. 182 (overwhelming evidence of guilt reduced likelihood that jury's decision was influenced by improper argument). Based on the Appellate Court's proper application of clearly established federal law, the Court concludes that Mr. Schiavo is not entitled to relief on either of his prosecutorial impropriety claims.

### C. The Ineffective Assistance of Counsel Claim

It is well-established that the Sixth Amendment right to the assistance of counsel

is the right to the effective assistance of counsel. *Eze*, 321 F.3d at 124 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14, 90 S. Ct. 1441 (1970)). A claim that counsel was ineffective is reviewed under the standard set forth in *Strickland*, 466 U.S. 668. To prevail, the petitioner must demonstrate, first, that counsel's performance "fell below an objective standard of reasonableness" established by "prevailing professional norms," and, second, that this deficient performance caused him prejudice. *Id.* at 687-88.

In evaluating the performance prong, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and make "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. To satisfy the prejudice prong of the *Strickland* test, the petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different;" the probability must "undermine confidence in the outcome" of the trial. *Id.* at 694.

When pursuing a state-exhausted ineffective assistance claim in federal court, it is not enough for the petitioner "to convince [the] federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. *Eze*, 321 F.3d at 124 (quoting *Bell*, 535 U.S. at 699). Rather, he must show that the state habeas court applied *Strickland* in an objectively unreasonable manner. *Id.*; *see also Williams*, 529 U.S. at 410 (unreasonable application of federal law different from incorrect application of federal law). "[A] state court unreasonably applies established federal law if the state court identifies the correct governing legal principle from [the United States

Supreme] Court's decisions but unreasonably applies that principle to the facts of the [petitioner's] case." *Williams*, 529 U.S. at 413.

Mr. Schiavo argues that his trial counsel, Mr. Moscowitz, did not effectively represent him during his criminal trial because he failed to present testimony from a crime scene reconstruction/forensic expert which he claims would have supported his justification defense. Am. Pet. at 35-37; Pet'r Reply 33-44.

In response, Warden Erfe argues that the state habeas court's conclusion that Mr. Moscowitz's decision not to present the testimony was neither deficient nor prejudicial constituted a reasonable application of United States Supreme Court precedent. Resp't Mem. at 33-48.

In this case, Mr. Schiavo has failed to show that the state habeas court's conclusions with respect to Mr. Moscowitz's performance constituted an unreasonable application of United States Supreme Court precedent. Although Mr. Massey's testimony might have been helpful in corroborating Mr. Schiavo's version of the shooting, it was not unreasonable for the state court to conclude that Mr. Moscowitz's decision not to present expert testimony was one of sound trial strategy.

The failure to present expert testimony, even if supportive of the defense, does not, in all circumstances, establish deficient performance. "Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Harrington*, 562 U.S. at 107 (quoting *Strickland*, 466 U.S. at 691). Here, the evidence showed that Mr. Moscowitz impeached Barbera's credibility, particularly her testimony about where Graham was standing at the moment he was shot. Criminal Trial Tr., 9/5/02 P.M., ECF No. 50-4, 106-11.

Furthermore, presenting expert testimony regarding the bullet trajectory, while perhaps helpful to the defense, would also draw the jury's attention to the location of the wound, which Mr. Moscowitz testified might have helped the state's case. *See id.* at 108-09 (expert testimony could have detrimental effect to petitioner's case); *Johnson v. Conway*, 763 F.3d 115, 154 (2d Cir. 2014) (counsel could have strategically refrained from calling expert out of fear that state could extract inculpatory evidence on cross-examination). The fact that Mr. Moscowitz would have presented Mr. Massey's testimony, if given the opportunity for a new trial does not, alone, show that his representation of Mr. Schiavo during the second criminal trial was deficient. *See Johnson*, 763 F.3d at 153 (court must eliminate distorting effects of hindsight when assessing counsel's performance under *Strickland* and evaluate conduct from counsel's perspective at the time). The state court reasonably concluded based on the evidence presented at the criminal trial and habeas trial that, despite the potentially helpful expert testimony, Mr. Moscowitz's representation did not fall below that of a reasonably competent attorney.

Mr. Schiavo has not cited any United States Supreme Court authority showing that the state court's conclusions regarding Attorney Moscowitz's performance was unreasonable, and the Second Circuit cases upon which he relies, *Bell v. Miller*, 500 F.3d 149 (2d Cir. 2007), and *Pavel v. Hollins*, 261 F.3d 210 (2d Cir. 2001), are distinguishable. Pet'r Reply at 32.

The Second Circuit has held that counsel's failure to consult a medical expert regarding the effects of trauma and significant blood loss on the victim's ability to identify his assailant was ineffective. *See Bell*, 500 F.3d at 156-57 (finding counsel's

choice could not be considered a strategic decision and lacked tactical justification). But there, the victim's testimony was the only evidence identifying the petitioner as the perpetrator of the crime, and the defense had presented multiple alibi witnesses testifying that the petitioner was not at the scene at the time of the shooting. *Id.* at 155-56 (noting there were no other eyewitnesses to the crime and other witnesses presented an alibi).

In the other case, trial counsel opted not to call any witnesses other than the petitioner, or conduct any meaningful pretrial investigation, solely because he believed that the trial court would grant his motion to dismiss the charges based on insufficient evidence. *See Pavel*, 261 F.3d at 217-18 (attorney's decision not to prepare for defense or call witnesses because he believed the motion to dismiss would be granted was not a strategic decision). As a result, the Second Circuit concluded that counsel's decision in that case did not constitute reasonably effective representation. *See id.* at 218 (holding that the attorney's decision not to call witnesses might have been strategic in some sense of the word, but "it was not the sort of conscious, reasonably informed decision made by an attorney with an eye to benefitting his client"). But that situation is not reasonably comparable to this one.[7]

By contrast, Mr. Moscowitz's decision not to present Mr. Massey's testimony was not deficient given his ability to attack Barbera's credibility through cross-examination and the potentially negative effects of presenting such testimony. *See Torres v.*

---

[7] Mr. Schiavo also relies on a Fifth Circuit case, *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005), to support his argument that Mr. Moscowitz was ineffective by failing to present expert testimony. Pet'r Reply at 32. In that case, the state appealed from a federal district court's decision to grant habeas relief after concluding that the state court unreasonably applied *Strickland* in finding no deficient performance or prejudice based on counsel's failure to obtain forensic evidence. *Id.* Like the case in *Bell*, however, there was an absence of any forensic evidence supporting the petitioner's conviction. *See Draughon*, 427 F.3d at 297. Here, as noted by the state habeas court, the state's case was not limited to a credibility contest between Barbera and Mr. Schiavo. The state presented other evidence of guilt, including the nature and location of Graham's wound and Mr. Schiavo's words and actions before and after the shooting.

*Maldonado*, No. 3:16-CV-925 (MPS), 2017 WL 5484670, at *10 (D. Conn. Nov. 15, 2017) (relevant evidence available from expert covered by trial counsel's cross-examination of state's expert). As for the prejudice component of *Strickland*, the state court reasonably concluded that the state had presented other evidence of guilt, including the physical evidence from the scene and medical examiner's report and testimony from other eyewitnesses about Mr. Schiavo's conduct before and after the shooting took place. *See Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017) (verdict with ample evidentiary support less likely to have been affected by counsel's errors than verdict weakly supported by record).

Moreover, the state court reasonably concluded that, even if the jury were not to accept Barbera's testimony about where Graham was standing at the time of the shooting, it still could discredit Mr. Schiavo's testimony that Graham made a threatening movement before Mr. Schiavo shot him.

Accordingly, based on the evidence presented, the state habeas court's decision did not constitute an unreasonable application of *Strickland* and its progeny.

## IV.    CONCLUSION

For the foregoing reasons, Mr. Schiavo's petition for writ of habeas corpus is

**DENIED**.

Because the Court concludes that reasonable jurists would not disagree over

whether the state courts' decisions constituted a reasonable application of well-settled

federal jurisprudence, a certificate of appealability will not issue.

The Clerk is directed to enter judgment in favor of Warden Erfe, the respondent,

and close this case.

**SO ORDERED** at Bridgeport, Connecticut this 10th day of April, 2020.

__/s/_____
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE